# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JUANITA JOAN GOIN,

     Plaintiff,

v.

NANCY A. BERRYHILL,
Acting Commissioner of
Social Security Administration,

     Defendant.

Case No.: 3:18-cv-00207-HDM-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF Nos. 14, 15

This Report and Recommendation is made to the Honorable Howard D. McKibben, Senior United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Plaintiff's Motion for Reversal and Remand. (ECF No. 14.) The Commissioner filed a Cross-Motion to Affirm and Response to Plaintiff's motion. (ECF Nos. 15, 16.)

After a thorough review, it is recommended that Plaintiff's motion be granted; the Commissioner's cross-motion to affirm be denied; and, that this matter be remanded for further administrative proceedings consistent with this Report and Recommendation.

## I. BACKGROUND

On January 18, 2015, Plaintiff completed an application for disability insurance benefits (DIB) under Title II of the Social Security Act alleging disability beginning September 16, 2013. (Administrative Record (AR) 166-167.) The applications were denied initially and on reconsideration. (AR 94-106.)

Plaintiff requested a hearing before an administrative law judge (ALJ). (AR 109-110.) ALJ Craig Denney held a hearing on November 18, 2016. (AR 30-63 .) Plaintiff, who was represented by counsel, appeared and testified on her own behalf at the hearing. Testimony was also taken from a vocational expert (VE). On February 23, 2017, the ALJ issued a decision finding Plaintiff not disabled. (AR 10-22.) Plaintiff requested review and the Appeals Council denied the request, making the ALJ's decision the final decision of the Commissioner. (AR 1-4.)

Plaintiff then commenced this action for judicial review under 42 U.S.C. § 405(g). Plaintiff argues: (1) the ALJ erred at step three in failing to consider whether Plaintiff's impairments met or equaled Listed Impairments 1.02 or 1.04; (2) the ALJ did not properly evaluate the medical opinion evidence of the treating and examining medical providers; and (3) the ALJ did not properly consider her subjective claims.

The Commissioner, on the other hand, argues that the ALJ properly: (1) did not consider Listed Impairments 1.02 and 1.04; (2) evaluated the medical opinion evidence; and (3) discounted Plaintiff's subjective complaints.

## II. STANDARDS

### A. Disability Process

After a claimant files an application for disability benefits, a disability examiner at the state Disability Determination agency, working with a doctor(s), makes the initial decision on the claimant's application. *See* 20 C.F.R. §§ 404.900(a)(1); 416.1400(a)(1). If the agency denies the claim initially, the claimant may request reconsideration of the denial, and the case is sent to a different disability examiner for a new decision. *See* 20 C.F.R. §§ 404.900(a)(2), 416.1400(a)(2). If the agency denies the claim on reconsideration, the claimant may request a hearing and the case is sent to an ALJ who works for the Social Security Administration. *See* 20 C.F.R. §§

404.900(a)(3), 416.1400(a)(3). The ALJ issues a written decision after the hearing. *See* 20 C.F.R. § 404.900(a)(3). If the ALJ denies the claim, the claimant may request review by the Appeals Council. *See* 20 C.F.R. §§ 404.900(a)(4), 416.1400(a)(4). If the Appeals Council determines there is merit to the claim, it generally remands the case to the ALJ for a new hearing. If the Appeals Council denies review, the claimant can file an action in the United States District Court. *See* 42 U.S.C. § 405(g); 20 C.F.R. §§ 404.900(a)(5), 416.1400(a)(5).

**B. Five-Step Evaluation of Disability**

Under the Social Security Act, "disability" is the inability to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled if his or her physical or mental impairment(s) are so severe as to preclude the claimant from doing not only his or her previous work but also, any other work which exists in the national economy, considering his age, education and work experience. 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step sequential process for determining whether a person is disabled.  20 C.F.R. §404.1520 and § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). In the first step, the Commissioner determines whether the claimant is engaged in "substantial gainful activity"; if so, a finding of nondisability is made and the claim is denied. 20 C.F.R. § 404.152(a)(4)(i), (b); § 416.920(a)(4)(i); *Yuckert*, 482 U.S. at 140. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to step two.

The second step requires the Commissioner to determine whether the claimant's impairment or combination of impairments are "severe." 20 C.F.R. § 404.1520(a)(4)(ii), (c) and § 416.920(a)(4)(ii), (c); *Yuckert*, 482 U.S. at 140-41. An impairment is severe if it significantly

limits the claimant's physical or mental ability to do basic work activities. *Id*. If the claimant has an impairment(s) that is severe, the Commissioner proceeds to step three.

In the third step, the Commissioner looks at a number of specific impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listed Impairments) and determines whether the claimant's impairment(s) meets or is the equivalent of one of the Listed Impairments. 20 C.F.R. § 404.1520(a)(4)(iii), (d) and § 416.920(a)(4)(iii), (d). The Commissioner presumes the Listed Impairments are severe enough to preclude any gainful activity, regardless of age, education or work experience. 20 C.F.R. § 404.1525(a), § 416.925(a). If the claimant's impairment meets or equals one of the Listed Impairments, and is of sufficient duration, the claimant is conclusively presumed disabled. 20 C.F.R. § 404.1520(a)(4)(iii), (d), § 416.920(a)(4)(iii), (d). If the claimant's impairment is severe, but does not meet or equal one of the Listed Impairments, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

At step four, the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f) and § 416.920(a)(4)(iv), (e), (f). Past relevant work is that which a claimant performed in the last 15 years, which lasted long enough for him or her to learn to do it, and was substantial gainful activity. 20 C.F.R. § 404.1565(a) and § 416.920(a).

In making this determination, the Commissioner assesses the claimant's residual functional capacity (RFC) and the physical and mental demands of the work previously performed. *See id.;* 20 C.F.R. § 404.1520(a)(4)(v), § 416.920(a)(4)(v); *see also Berry v. Astrue*, 622 F.3d 1228, 1231 (9th Cir. 2010). RFC is what the claimant can still do despite his or her limitations. 20 C.F.R. § 404.1545 and § 416.945. In determining the RFC, the Commissioner must assess all evidence, including the claimant's and others' descriptions of the limitation(s), and medical reports, to

determine what capacity the claimant has for work despite his or her impairments. 20 C.F.R. § 404.1545(a)(3) and  416.945(a)(3).

A claimant can return to previous work if he or she can perform the "actual functional demands and job duties of a particular pat relevant job" or "[t]he functional demands and job duties of the [past] occupation as generally required by employers throughout the national economy." *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001) (internal quotation marks and citation omitted).

If the claimant can still do past relevant work, then he or she is not disabled. 20 C.F.R. § 404.1520(f) and § 416.920(f); *see also Berry*, 62 F.3d at 131.

If, however, the claimant cannot perform past relevant work, the burden shifts to the Commissioner to establish at step five that the claimant can perform other work available in the national economy. 20 C.F.R. §§ 404.1520(e), 416.920(e); *see also Yuckert*, 482 U.S. at 141-42, 144. This means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 528 (9th Cir. 2014). If the claimant cannot do the work he or she did in the past, the Commissioner must consider the claimant's RFC, age, education, and past work experience to determine whether the claimant can do other work. *Yuckert*, 482 U.S. at 141-42. The Commissioner may meet this burden either through the testimony of a VE or by reference to the grids. *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).

If at step five the Commissioner establishes that the claimant can do other work which exists in the national economy, then he or she is not disabled. 20 C.F.R. § 404.1566(b), § 416.966(b). Conversely, if the Commissioner determines the claimant unable to adjust to any other work, the claimant will be found disabled. 20 C.F.R. § 404.1520(g), § 416.920(g); *see also*

1  *Lockwood*, 616 F.3d at 1071; *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir.

2  2009).

3  **C. Judicial Review & Substantial Evidence**

4      The court must affirm the ALJ's determination if it is based on proper legal standards and

5  the findings are supported by substantial evidence in the record. *Gutierrez*, 740 F.3d at 522 (citing

6  42 U.S.C. § 405(g)). "Substantial evidence is 'more than a mere scintilla but less than a

7  preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

8  support a conclusion." *Id.* at 523-24 (quoting *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

9      To determine whether substantial evidence exists, the court must look at the record as a

10  whole, considering both evidence that supports and undermines the ALJ's decision. *Gutierrez*,

11  740 F.3d at 524 (citing *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001)). The court "'may

12  not affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*,

13  759 F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir.

14  2007)). "'The ALJ is responsible for determining credibility, resolving conflicts in medical

15  testimony, and for resolving ambiguities.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039

16  (9th Cir. 1995)). "If the evidence can reasonably support either affirming or reversing, 'the

17  reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez*,

18  740 F.3d at 524 (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)). That being

19  said, "a decision supported by substantial evidence will still be set aside if the ALJ did not apply

20  proper legal standards." *Id.* (citing *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th

21  Cir. 2009); *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)). In addition, the court will

22  "review only the reasons provided by the ALJ in the disability determination and may not affirm

23

the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010 (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).

### III. DISCUSSION

**A. Medical Records Summary**

Plaintiff was working as a caregiver in September of 2013, when she was transferring a patient from a wheelchair and felt a pop in her back and significant back pain. (AR 420.) She was transported to the emergency room via ambulance, and on examination had significant tenderness to palpation in the L4-5 region as well as along the lumbosacral region. (AR 420.) An x-ray of the lumbar spine was unremarkable for any acute abnormality. (AR 426.) She was given Vicodin and valium which gave her some relief. She was assessed with lumbosacral strain and was advised to follow up with her doctor. (AR 422.)

On December 2, 2013, after initiating a workers' compensation claim, she established care with physiatrist Dr. Dallin DeMordaunt of the Nevada Occupational Health Center. She reported worsening back pain, and difficulty walking because her cane had broken. She had pain that radiated to mid-calf when she was standing, and right above the knee while sitting. She had limited range of motion, limited functional ability, limited sensation, and an antalgic gait. She was assessed with lumbar radiculopathy and central sensitization. (AR 350.) She was restricted as follows: bending was limited to five hours per day; no kneeling; no lifting or pulling greater than 10 pounds; no squatting; she should alternate sitting and standing as tolerated. (AR 354.)

She saw Dr. DeMordaunt again on December 12, 2013, for low back pain and referred pain in the lower extremities, which was greater on the right side. She had begun physical therapy, which gave her some short-term relief but then led to increased pain and a return to her baseline amount of pain. She reported aching pain across the low back and buttocks, and aching, burning,

numbness and tingling down the right lower extremity to the ankle. She was taking Percocet and Flexeril three times a day. (AR 352.) On examination, she had tenderness to palpation in the midline lumbar spine, mid and lower lumbar spine, right upper-mid and lower lumbar paraspinals and a little on the left side as well. As for range of motion, her trunk flexion was reduced with her hands reaching not quite to her knees. She had pain across her back with the two-point straight leg test and Patrick's test bilaterally. She had an antalgic gait on the right. She reported decreased sensation throughout the right lower extremity. She was diagnosed with lumbar strain and sprain and agreed to proceed with trigger point injections. (AR 353.) It was noted that she was making minimal/modest gains, and that if she did not respond to the trigger point injections, they would consider facet injections, and if that provided no relief a second opinion would be considered. (AR 354.)

At physical therapy a few days later, she still had pain, and she had maximum limitation in her spinal flexion, and her overall improvement was described as poor. (AR 355.)

Notes from her remaining December 2013 and January 2014 appointments reflect that her pain, tenderness, numbness and tingling, decreased sensation and limited range of motion continued. (AR 357-364.) She had no relief from physical therapy or the trigger injections. (*Id*.) She had an EMG, which was negative for radiculopathy. (AR 364.) She was referred to an orthopedist. On December 19, 2013, Dr. DeMordaunt said she could not lift or pull more than 10 pounds; she was limited to bending five times per hour; and she should alternate between sitting and standing as tolerated. (AR 358.) The restrictions were the same after her January 9, 2014 appointment, with the added restrictions that she could not squat or kneel. (AR 364.)

She saw orthopedist Dr. James R. Rappaport of Sierra Regional Spine Institute for an initial consultation on January 15, 2014, for continuing low back pain radiating to the entire right lower

extremity. On examination, she had: "exquisite" tenderness to the lightest palpation of the lumbar spine; significant tenderness over all lumbar facet joints and spinous processes; significant tenderness over both SI joints; limited range of motion with pain; mild muscle spasm; positive SI area testing; and, decreased sensation in the right lower extremity. Her diagnoses at that point included: facet mediated low back pain; lumbar spondylosis; foraminal stenosis; sacroiliitis; lumbar radiculopathy; myofascial pain; and, positive Waddell signs. Dr. Rappaport suggested diagnostic selective nerve root blocks at L4, L5, and S1 on the right side, with a note she may be a candidate for decompression surgery. (AR 547.) He assessed her as being limited to lifting 10 pounds or less; she should have the ability to change positions as needed; and she should avoid bending, twisting the waist, reaching above shoulder height, and climbing. (AR 543.)

She saw both Dr. DeMordaunt and Dr. Rappaport in January through April of 2014, with continued complaints of sharp and aching pain, and numbness and burning down the lower right extremity. She was extremely tender to palpation in the lower lumbar spine and had minimal lumbar range of motion. Dr. DeMordaunt administered the right L-5 selective nerve root block, which provided her with no relief, and if anything, resulted in a worsening of her symptoms. (AR 365-67, 541 543.) She subsequently underwent selective nerve root blocks at L-4 and S-1, which also gave her no relief. (AR 368, 541, 369, 370, 538.) Having no success with non-operative treatment, an updated EMG to attempt to localize the radiculopathy as well as an MRI were ordered as Plaintiff wished to proceed with surgery. (AR 540.) At her February 27, 2014, appointment with Dr. DeMordaunt, he included the following work restrictions: limited bending; no kneeling; no lifting, pulling or pushing greater than 10 pounds; no squatting; alternate sitting and standing as tolerated. (AR 368.) At her March 27, 2014, appointment with Dr. DeMordaunt, he restricted her

1  to no lifting, pushing or pulling more than 10 pounds; only occasional bending; no squatting; and

2  alternating between sitting and standing as tolerated. (AR 370.)

3      The EMG study was normal. (AR 538.) The April 29, 2014 MRI showed: lumbar disc

4  herniation at L5-S1 and L4-5; loss of signal at 5-1 with disc space narrowing and loss of signal at

5  4-5; subarticular recess stenosis at 5-1; foraminal stenosis left greater than right at 5-1; facet

6  arthropathy at 5-1; disc herniation at 4-5, left greater than right foraminal stenosis and moderately

7  severe arthropathy.  (AR 536.) When she saw Dr. Rappaport on May 15, 2014, she still had severe

8  pain, decreased sensation, limited range of motion, and positive bilateral sciatic tension signs. She

9  was assessed with lumbar internal disc disruption syndrome at L4-5, L5-S1; lumbar facet arthrosis;

10  lumbar subarticular recess stenosis, with lumbar radiculitis. It was noted that she had failed with

11  non-operative treatment, and her symptoms prevented her from doing activities of daily living and

12  her work. (AR 536.) Dr. Rappaport recommended a lumbar discectomy, laminectomy and fusion

13  at L4-S1. Due to her body habitus and severity of the MRI findings, he opined this would be best

14  accomplished through a two-stage approach: a posterior laminectomy followed by the anterior

15  discectomy. (AR 537.)

16      At her May 29, 2014, appointment with Dr. DeMordaunt, she still had pain and tenderness

17  in the lumbar spine, reduced range of motion with increased pain, and decreased sensation in the

18  right lower extremity. She had a slow gait. She was restricted to no lifting, pushing or pulling more

19  than 10 pounds; occasional bending; no squatting; and alternating between sitting and standing as

20  tolerated. (AR 372.)

21      Her pain and other symptoms worsened as she awaited authorization for surgery. In fact,

22  when she saw Dr. Rappaport on July 2, 2014, they were described as "intolerable" and had

23  significantly increased. (AR 372, 534-35.) She had a very difficult time ambulating, and

10

Dr. Rappaport's office loaned Plaintiff a wheelchair. (AR 534.) On August 13, 2014, Dr. Rappaport still had not received authorization for the surgery, and he noted that Plaintiff's condition appeared to be deteriorating. (AR 532.) When she saw Dr. DeMordaunt the next day, she reported doing worse with significant pain. She required a wheelchair because she would fall over when standing due to pain and weakness. The pain now stretched up into the thoracic spine, and continued in the lumbar spine, radiating to the lower extremities. (AR 373.) At that point, he restricted her to no lifting, pushing or pulling over 10 pounds; no squatting; and, she was to alternate between sitting and standing as tolerated. (AR 374.) Nothing was said about bending. He recommended she see a pain management physician and pain psychologist. (AR 374.)

It appears she was approved for surgery when she saw Dr. Rappaport on August 27, 2014. (AR 379.) She was still using a wheelchair, and while she was able to get up and take a few steps and get on and off the exam table, it was quite slow and with obvious pain. She still had significant tenderness to palpation in the lumbar spine as well as over both SI joints, limited range of motion, and decreased sensation in the right leg. (AR 381.)

Plaintiff underwent the first phase of the surgery—lumbar decompression and fusion from L4 to S1—with Dr. Rappaport on September 2, 2014. At that time, he noted she had been using a wheelchair, as well as a walker to get around the house and was not driving. (AR 383.) In her initial follow up appointment, she indicated her radicular symptoms improved. (AR 527-28.) On September 17, 2014, it was noted that her radicular symptoms, while somewhat improved, continued to varying degrees. (AR 549.)

Plaintiff underwent the second phase of the surgery—the anterior discectomy—with Dr. Rappaport and vascular surgeon Dr. Thomas E. Rembetski, on September 23, 2014. (AR 432-473.) When she saw Dr. Rappaport following the second surgery on October 1, 2014, she reported

continued back pain with some radicular symptoms to the left leg. A neurological examination showed continued weakness in the right leg. (AR 522.) When she saw Dr. Rappaport on October 15, 2014, he noted her radicular pain had improved only mildly. She was also having abdominal wall pain near the incision site. (AR 521.) She went to the emergency room for the abdominal pain, and eventually had an incisional hernia repair, which had its own complications and required another procedure to remove pressure that a stitch was putting on a nerve. (AR 424-29, 477-94, 495-96, 508, 578, 580-584, 626-31, 677-79, 690, 693.)

When she saw Dr. Rappaport on November 5, 2014, she had right leg pain. (AR 520.) At that point he classified her work status as temporarily totally disabled. (AR 520.) On December 10, 2014, she was still using a walker for ambulation. She continued to report weakness in both lower extremities, though he noted it was improving. (AR 518.) he remained at temporary totally disabled work status. (AR 518.)

On January 9, 2015, she reported to Dr. Rappaport that she had increasing low back pain directly above the fusion site at the thoracolumbar junction and again over the right SI joint. She had burning and numbness and pain in the anterior and posterior thigh. He noted that prior to surgery she had decreased ambulating and was using a wheelchair, and after surgery she continued to use a walker. On examination, she had mild tenderness at the surgical site, and exquisite tenderness over the SI joint. She had moderate muscle spasm with trigger point formation noted at the thoracolumbar junction. Her diagnoses included: status post lumbar decompression/fusion; low back pain; lumbar spondylosis; sacroiliitis; and, myofascial pain with trigger point formation. (AR 516.)

Dr. DeMordaunt gave her a right SI joint injection, but it provided no relief. On February 19, 2015, she reported increased back pain at the thoracolumbar junction and over the

right SI joint. She still had difficulty walking. (AR 622.) Dr. DeMordaunt performed an EMG and nerve conduction study on March 13, 2015, which was normal on the right side but abnormal as to the left lower extremity, which curiously was asymptomatic. Dr. DeMordaunt felt this may suggest development of left L5 radiculopathy, which he felt was concerning and should be monitored. (AR 621.)

She saw Michael J. Lewandowski, Ph.D., of Behavioral Medicine Consultants for a behavioral medicine and psychological intake evaluation on March 18, 2015. She was using a walker and back brace and reported falling frequently. She indicated that sitting, standing and walking all aggravated her pain, and that she frequently had to drag her right leg due to pain. (AR 634-35.) She reported a significant reduction in her activity levels as a result of her injury.

She saw Dr. Rappaport again on March 19, 2015. She walked with a stiff right hip and had tenderness over the right SI joint. She was advised to initiate physical therapy for core stabilization and right SI joint work. He assessed her work status at that point as sedentary only, and it was noted she could not drive. (AR 619.) She followed up with Dr. Rappaport the following month, and still had pain with radicular symptoms in the right leg as well as SI joint pain. Physical therapy had been making her symptoms worse, and she was advised to stop. He assessed her as having significant sacroiliitis and referred her to a SI joint specialist and for pain management. She was to continue taking Percocet, though he discussed with her the importance of weaning off from ongoing narcotic use. Her work status was still described as sedentary. At that point, he stated her prognosis was somewhat guarded secondary to the development of significant sacroiliitis. (AR 618.)

She had a follow up with Dr. Rappaport on May 13, 2015, and workers' compensation had denied her treatment for the SI joint pain. On examination, she still had pain over the right SI joint;

1  was walking with a limp on the right side; and used a walker. She was going to try to transition

2  from Percocet to Ultram or Meloxicam. There was no change in her sedentary work assessment.

3  (AR 616.)

4        By June 10, 2015, she had weaned herself off the opioids. (AR 651.) When she saw

5  Dr. Rappaport that day she indicated she was ready to proceed with closure of her workers'

6  compensation claim. She still had back pain and radicular symptoms. She was advised to follow

7  up with her primary care provider. (AR 614.) He assessed her work status as follows at that time:

8  she could not lift greater than 20 pounds, with no repetitive lifting greater than 10 pounds; she

9  could bend at the hips but should not bend at the lumbar spine; standing and sitting were unlimited,

10  but she should change between positions for five minutes every hour. He indicated that these were

11  permanent restrictions. (AR 614.)

12        She initiated care with Dr. Cesar Udani of Sierra Nevada Health Center on July 6, 2015.

13  She still had piercing, sharp and shooting back pain, and was using a walker to ambulate. (AR 554.)

14  She had lumbar spine tenderness and moderate pain with range of motion. (AR 556.)

15        On July 8, 2015, Michael A. Glick, D.O., examined Plaintiff and subsequently completed

16  a permanent partial disability evaluation report. He concluded she had a 32 percent whole person

17  impairment attributed to her occupational injury. (AR 601-02.) At that point, she complained of

18  pain bilaterally in her back, that was shooting in the legs, back and hips; she had numbness and

19  tingling in the legs and buttocks, and weakness in her legs; she had shooting pain while walking;

20  and was using a walker. She rated her sitting tolerance as 15-20 minutes, her walking tolerance as

21  10 minutes, and her standing tolerance depended on how her legs were doing. (AR 605.)

22        She described her daily activities as follows: she used adaptive tools such as a long-handled

23  sponge for bathing; with grooming she needed help shaving her legs; she was limited with dressing,

and needed assistance with her socks; she could not bend or reach, and had an extended grabber to help with dressing; she had problems concentrating due to being unable to get comfortable; she had problems standing, sitting, reclining, walking, stooping, squatting, kneeling, reaching, bending, twisting and carrying, which all caused her pain; she could lift maybe 10 pounds; driving was difficult; and she had difficulty sleeping.

On examination, she had tenderness in the lumbar spine; some give-way weakness in the right lower extremity with flexion and extension of the leg; decreased sensation in the entire right leg to pin prick and light touch; and limited range of motion. She tended to drag her right leg. (AR 608.)

She continued to complaint of back pain in her visits with Dr. Udani between October 6, 2015 and November of 2016. (AR 735-38, 740-43, 761, 96.) She went to physical therapy, but was discharged with her goals unresolved as she experienced severe pain with therapy. (AR 655-69.) She reported to her physical therapist she could sit for 10 to 15 minutes; she could stand for one minute; and she could walk half a block. She described significant functional limitations due to her pain and weakness, including difficulty sitting, standing, walking, with housework and dressing, and doing the wash. (AR 659, 663, 665.)

She was assessed with chronic low back pain and bilateral sciatica. (AR 796.) She was referred to orthopedics for a re-evaluation, though there are no additional records from an orthopedist in the record. (AR 739.)

**B. Hearing Testimony**

Plaintiff testified at the hearing that she was living with her cousin, and she was no longer driving so her mother drove her to the hearing. (AR 37.) She could not drive because she could not feel the pedals with her feet. (AR 54.) Riding in the car also caused her to go numb. (AR 54.)

1  She described her back pain as radiating down to her legs and feet, making them numb, and caused

2  her difficulty walking, standing, sitting and getting comfortable in any position. (AR 40.) She had

3  no feeling in her right leg which she dragged when ambulating. (AR 40.)

4      She relied on others to get her to and from appointments, shopping, and any activities, and

5  needed her cousin's assistance around the house with vacuuming, laundry, and unloading the

6  dishwasher. (AR 40.) She could make simple meals. (AR 40-41.) She could take a shower, bathe

7  and dress herself using adaptive equipment such as a long-handled sponge, long handles to put on

8  her socks and shoes, and grabbers to pick things up off the floor. (AR 41.) She could assist with

9  grocery shopping with the use of a wheelchair, but could not grocery shop on her own. (AR 42,

10  53.) She had been using a walker for approximately two years, which was prescribed by her doctor.

11  (AR 41.) Her cousin took care of her dogs. (AR 42.) She did not watch much television and could

12  not stay comfortable enough to read. (AR 45.)

13      Using the walker, she could walk for 10 minutes without falling, otherwise she would have

14  to use a wheelchair because her legs would not hold her up. (AR 43.) With the walker, she could

15  stand for 10 to 15 minutes. (AR 43.) She could sit for 15 minutes. (AR 43.) Then she would have

16  to switch positions. (AR 44.) She estimated she could lift and carry five pounds with the assistance

17  of the walker. (AR 44.) If she dropped something, she would use the grabber to pick it up. (AR 44.)

18  She could not go up or down stairs and could not reach above her shoulders on one side because

19  she just had breast surgery to remove a mass on the right side. (AR 44.) She asked to stand up

20  during the hearing. (AR 45.)

21      She described her pain level before the surgery at between a seven or eight on a scale of

22  one to ten, and six months after the surgery it was worse—between an eight and a ten. (AR 47.)

23

That particular day, her back pain level was between a nine and a ten. (AR 47.) She still had pain radiating in both legs, with numbness and tingling. (AR 48.)

She testified that she could maybe sit for a total of two hours if she spread out the sitting through the workday. (AR 52.) Standing was harder for her than sitting. (AR 52.) She could maybe be up standing for two hours over the course of a day. (AR 52.)

The ALJ posed a hypothetical to the VE for a person who was limited to sedentary work, who could stand and walk for two hours; lift and carry less than ten pounds; never climb ramps, stairs or crawl; could occasionally balance, stoop, kneel and crouch; had to avoid exposure to fumes, odors, dust, gases and poor ventilation as well as exposure to moving mechanical parts and avoid exposure to all unprotected heights; and, would need a walker to ambulate. (AR 58-59.) The VE testified that the person could perform the jobs of an addresser, a charge account clerk, and a final assembler. (AR 59.)

The ALJ then added to the hypothetical a limitation that the person required a sit/stand option at will for up to five minutes every two hours as needed in an eight-hour workday. (AR 59.) The VE testified that this would eliminate the addresser position, and would erode the charge account clerk position by 75 percent and the final assembler position by 90 percent. (AR 59-60.) The ALJ also added to the hypothetical a limitation that the person would be off task 15 percent of the workday, and would miss more than two days of work per month. (AR 60.) The VE testified that would erode the labor market completely. (AR 60.)

Plaintiff's attorney then posed a hypothetical to the VE that limited the person to a need to sit/stand at will every ten to fifteen minutes, and could lift five pounds occasionally and less than five pounds frequently, among other things. (AR 61.) The VE testified this would also erode the labor market completely. (AR 61.) Additionally, Plaintiff's attorney asked the VE about the

1   situation where the claimant had to take breaks throughout the day for pain and headaches, such

2   as four or five unscheduled breaks for ten to fifteen minutes in duration, and the VE testified this

3   would erode the labor market completely. (AR 62.)

4   **C. Plaintiff's Adult Function Report & Lay Witness Statement**

5        Plaintiff filled out an Adult Function Report on February 9, 2015. (AR 259-266.) She stated

6   she could not lift, bend, stoop, crouch, kneel, reach, climb, walk, stand or sit for long. She had to

7   use a walker to get around. She had little to no feeling in her right leg, and it dragged while moving.

8   She would fall often and could not drive. She had pain with walking, standing, sitting and moving

9   around. (AR 259.)

10       She had assistance getting to the shower, and someone would put socks on her feet.

11  (AR 260.) She would change positions throughout the day (sitting, laying, standing). She made

12  simple meals for herself. (AR 260.) She did not get much sleep, as lying flat made her body numb.

13  (AR 260.)

14       Again, she required assistance with shoes and socks, and toiletries had to be accessible.

15  (AR 260.) She could care for her hair to a point, but needed help shaving her legs. (AR 260.) She

16  could feed herself and use the toilet. (AR 260.) She required help to do household chores.

17  (AR 261.) She could put items in the washer, but the laundry had to be within reach. (AR 261.)

18  Bending precluded her from putting clothes in the dryer, and from cleaning. (AR 261.) She

19  indicated her roommate did everything. (AR 261.)

20       She would usually go out only to go to appointments. (AR 262.) She reiterated that she did

21  not drive because she could not gage the pedal pressure. (AR 262.) She shopped for food, clothes

22  and personal care items once a week. (AR 262.) She needed someone to accompany her on outings.

23  (AR 263.)

18

1    Plaintiff's cousin, Edgar Ricard, also submitted a statement. (AR 308-310.) Plaintiff lived

2  with her cousin. He confirmed she used adaptive equipment to shower including a stool to sit on

3  and a long-handled brush to wash with. He made sure all soaps were within reach, as well as her

4  phone and walker. She rarely left the house except for grocery shopping and for doctor

5  appointments accompanied by him or her mother. She could barely walk, and her right leg dragged

6  and was numb. She relied on the walker to get around. She could not stoop, kneel or bend over as

7  she tended to fall. She could no longer drive. Edgar also assisted with dressing and did all the

8  housework. (AR 308.) She would change positions often to get comfortable and did not stay in

9  one position for long. She had blackouts and migraines, as well as falls from unsteady legs.

10  (AR 309.) She could not even walk half a block. (AR 310.)

11  **D. ALJ's Findings in this Case**

12    At step one, the ALJ found Plaintiff met the insured status requirements through

13  December 31, 2013, and had not engaged in substantial gainful activity since the alleged onset

14  date of September 16, 2013. (AR 15.)

15    At step two, the ALJ concluded Plaintiff had the following severe impairments:

16  degenerative disc disease of the lumbar spine with radiculopathy, and obesity. (AR 15.)

17    At step three, the ALJ determined Plaintiff did not have an impairment or combination of

18  impairments that met or medically equaled the severity of one of the Listed Impairments. (AR 16-

19  17.) The ALJ stated that he considered all the physical impairments and in particular Listed

20  Impairment 1.04, in finding she did not meet or equal any listing.

21    At step four, the ALJ assessed Plaintiff as having the RFC to perform a reduced range of

22  sedentary work as defined in 20 C.F.R. §404.1567(a). She could lift and carry less than 10 pounds;

23  she could stand and walk for two hours; she could occasionally balance, stoop, kneel and crouch,

but was precluded from climbing ramps, stairs, ladders, ropes or scaffolds. She was precluded from crawling. She was to avoid all exposure to fumes, dusts, odors, gases, poor ventilation, moving mechanical parts and unprotected heights. Finally, she required a walker to ambulate. (AR 17.)

The ALJ then concluded Plaintiff was unable to perform any past relevant work. (AR 20.)

At step five, the ALJ determined, based on VE testimony, that considering Plaintiff's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including: addresser (Dictionary of Occupational Titles (DOT) Number 209.587-010); charge account clerk (DOT Number 205.367-014); and final assembler (DOT Number 713.687-018). (AR 20-21.) As a result, the ALJ found Plaintiff not disabled from September 16, 2013, through the date of the decision. (AR 22.)

**E. Step Three Findings and Listings 1.02 and 1.04**

At step three, the ALJ must assess whether the claimant has an impairment or combination of impairments that meets or equals a Listed Impairment in the Appendix to the federal regulations. 20 C.F.R. § 404, subpart P, App. 1. The Listed Impairments "describe[ ] specific impairments of each of the major body systems 'which are considered severe enough to prevent a person from doing any gainful activity.'" *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999) (citing 20 C.F.R. § 404.1525). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *Tackett*, 180 F.3d at 1099. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530 (citations omitted). "To *equal* a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment, or, if a claimant's impairment is *not* listed, then

to the listed impairment 'most like' the claimant's impairment." *Tackett*, 180 F.3d at 1099 (citing 20 C.F.R. §1526).

Plaintiff argues that the ALJ erred at step three in finding Plaintiff's impairments did not meet or equal any Listed Impairment because the ALJ did not properly account for Plaintiff's degenerative disc disease of the lumbar spine with radiculopathy in combination with her other medically determinable impairments and inability to effectively ambulate without a walker. Plaintiff quotes the language of Listed Impairments 1.02A and 1.04C, and acknowledges it is the claimant's burden to prove she has an impairment(s) that meets or equals a listing, but nevertheless argues that the ALJ still has to discuss and evaluate the evidence before concluding a claimant's impairment(s) does not meet or equal a listing. Additionally, Plaintiff contends that under Social Security Ruling (SSR) 96-9P, the ALJ must obtain an updated medical expert opinion before making a decision of disability based on medical equivalence.

The Commissioner argues that Plaintiff's argument regarding Listed Impairment 1.02A has no merit because it concerns major dysfunction of weight bearing joint(s), and Plaintiff does not explain how this listing is applicable or how she meets or equals its requirements. The Commissioner also argues that the ALJ considered Plaintiff's impairments and found she did not meet or equal the requirements of Listed Impairment 1.04. The Commissioner contends that Plaintiff does not explain how her impairment(s) did so, aside from quoting the listing and stating that she had difficulties walking.

Both listings 1.02A and 1.04C come under the musculoskeletal category of impairments. Listed Impairment 1.02A provides:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the

affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e, shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 200.B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listed Impairment 1.02A.

Listed Impairment 1.04C governs disorders of the spine and provides:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listed Impairment 1.04C.

The ALJ stated that he considered all of Plaintiff's physical impairments singly and in combination, and found that they did not meet or medically equal any of the Listed Impairments. (AR 16-17.) The ALJ specifically addressed Listed Impairment 1.04, and stated that no treating or examining physician has recorded findings equivalent in severity to the criteria of any Listed Impairment, and the evidence did not show medical findings the same or equivalent to those of any Listed Impairment. (AR 16-17.)

The claimant bears the burden of establishing a prima facie case of disability under the Listed Impairments. *See Tackett*, 180 F.3d at 1099. The claimant must offer a plausible theory as to how her impairment(s) met or equaled a Listed Impairment, or point to evidence that the impairment(s) met or equaled a Listed Impairment. *Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001).

Plaintiff simply cites the language of Listed Impairments 1.02A and 1.04C without explaining how she met or equaled these listings, or pointing to any evidence to support her argument.

With respect to Listed Impairment 1.02A, there must be involvement of a major peripheral weight-bearing joint that results in the inability to perform fine and gross movements effectively. The appendix clarifies that "major peripheral joints" are the hip, knee, shoulder, elbow, wrist-hand, and ankle-foot, as opposed to other peripheral joints (hand or forefoot) or axial joints (spine). 20 C.F.R. Part 404, Subpt. P, App. 1, Listing 1.00F. Plaintiff does not point out what major peripheral weight-bearing joint was involved and how it resulted in an inability to perform fine and gross movements effectively. Therefore, the court finds the ALJ did not err in specifically not commenting on whether or not Plaintiff met or equaled Listed Impairment 1.02A.

With respect to Listed Impairment 1.04C, Plaintiff again fails to state how she met or equaled this listing, and does not point to any evidence to support her argument. Nevertheless, the court finds that the medical evidence does contain findings that present a question to the court as to whether Plaintiff did in fact meet or equal Listed Impairment 1.04C. First, Listed Impairment 1.04 requires a disorder of the spine (such as a herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture) that results in compromise of a nerve root or the spinal cord.  Plaintiff's April 29, 2014 MRI confirmed disc herniation, disc space narrowing, stenosis, and facet arthropathy. (AR 536.) As to whether it resulted in a compromise of a nerve root or spinal cord, spinal stenosis itself is defined as a "narrowing of the spaces within your spine, *which can put pressure on the nerves that travel through the spine*." https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961, last visited February 14, 2019.

For Listed Impairment 1.04C, there must also be lumbar spinal stenosis that results in pseudoclaudication established by medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in the inability to ambulate effectively, as defined in 1.00B2b.

Pseudoclaudication "can be a symptom of lumbar spinal stenosis, a condition that occurs when the spinal canal narrows in your lower back. This narrowing can be caused by bulging disks, bone spurs or a thickening of the supportive ligaments in the back of the spinal canal." https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/expert-answers/pseudoclaudication/faq-20057779, last visited February 14, 2019.

None of Plaintiff's records specifically refer to pseudoclaudication. Her April 29, 2014, MRI did confirm disc herniation, disc space narrowing, stenosis and facet arthropathy, which as far as the court can tell might qualify as pseudoclaudication. (AR 536.)

The record is clear that Plaintiff suffered from chronic radicular as well as nonradicular pain and weakness, particularly in the lumbar spine and right lower extremity, but later over the SI joints and both lower extremities.

Finally, she required the use of a walker to ambulate, and the ALJ's RFC included such a limitation.

The undersigned is not a medical doctor, but it appears there may be evidence that she had a spinal disorder that compromised a nerve root, and resulted in pseudoclaudication, manifested by chronic nonradicular pain and weakness, and an inability to ambulate effectively.

These findings warrant remand for the ALJ to consider whether Plaintiff did in fact meet or equal Listed Impairment 1.04C, and whether an updated medical expert opinion is required to make this determination.

**F. Medical Opinion Evidence**

Next, Plaintiff argues that the ALJ failed to appropriately consider and weigh the opinions of Plaintiff's treating physicians, Dr. DeMordaunt and Dr. Rappaport, and the consultative examiner, Dr. Glick. Plaintiff contends that the opinions were consistent with one another and the ALJ did not give a reasonable explanation for subordinating these opinions to those of the non-examining State agency consultants.

The Commissioner argues that the ALJ properly considered the medical opinions and assessed an RFC with the greatest functional limitations supported by the record.

**1. Standard**

"'In disability benefits cases … physicians may render medical, clinical opinions, or they may render opinions on the ultimate issue of disability—the claimant's ability to perform work.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). "Courts 'distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physician); and (3) those who neither examine nor treat the claimant (nonexamining physicians).'" *Garrison*, 759 F.3d at 1012 (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). "'As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant.'" *Id.* "[T]he opinion of a treating physician is thus entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012 (citing *Ryan*, 528 F.3d at 1198).

"If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the]

case record, [it will be given[ controlling weight." *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014) (citation and quotation marks omitted); *see also Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (citing 20 C.F.R. § 404.1527(c)(2))). "Greater weight is also given to the 'opinion of a specialist about medical issues related to his or her area of specialty.'" *Revels*, 874 F.3d at 654 (citing 20 C.F.R. § 404.1527(c)(5)). "'The weight afforded a non-examining physician's testimony depends on the degree to which [he or she] provide[s] supporting explanations for [his or her] opinions." *Garrison*, 759 F.3d at 1012.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.'" *Garrison*, 759 F.3d at 1012. "[E]ven when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight … even if it does not meet the test for controlling weight.'" *Garrison*, 759 F.3d at 1012 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)). "An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Garrison*, 759 F.3d at 1012 (quoting *Reddick*, 157 F.3d at 725). "'The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.'" *Id*. (citation omitted).

If an ALJ decides not to give a treating physician's opinion controlling weight, the ALJ must apply the factors set out in 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) in determining how much weight to give each opinion. *See Revels*, 874 F.3d at 654. The factors

include length of treatment relationship and frequency of examination, nature and extent of treatment relationship, supportability, consistency, specialization, and other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c), § 416.927(c). The failure to consider these factors constitutes reversible legal error. *Trevizo v. Berryhill*, 871 F.3d 664, 676 (9th Cir. 2017).

### 2. Medical Opinions

Dr. DeMordaunt assessed Plaintiff with the following limitations over the course of treating her between December 2013 and March of 2015: she could lift, push or pull no more than ten pounds; she could bend five times per hour (he later limited her to occasional bending); and, she could alternate sitting and standing as tolerated. (AR 354, 358, 364, 366, 368, 370, 372, 374, 621.)

Dr. Rappaport initially assessed Plaintiff with the following limitations: she could lift ten pounds or less; she required the ability to change positions as needed; she should avoid bending, twisting at the waist, stooping, reaching above the right shoulder, and climbing. (AR 543.) Dr. Rappaport opined she was limited to sedentary status. (AR 616, 618, 619.) His opinions as to her functional abilities upon his final visit with Plaintiff were that: she could lift no greater than 20 pounds, but repetitive lifting was limited to ten pounds; she should not bend at the lumbar spine; and she should change positions between sitting and standing for five minutes every hour. (AR 614.) He characterized these as permanent restrictions.

At the initial level, State agency non-examining consulting physician Charles K. Lee, M.D., opined on April 14, 2015, that Plaintiff could: occasionally lift/carry 20 pounds, and frequently lift/carry 10 pounds; her ability to push and pull was unlimited; she could stand and/or walk six hours in an eight-hour work day; she could sit six hours in an eight-hour work day; she could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; she could frequently balance;

she could occasionally stoop, kneel, crouch and crawl; she should avoid concentrated exposure to vibration and hazards. (AR 73-74.)

Dr. Glick completed a permanent partial disability evaluation for Plaintiff's workers' compensation case on July 11, 2015, and noted Plaintiff had problems standing, sitting, walking, stooping, squatting, kneeling, reaching, bending, twisting, and carrying, which all caused her pain. (AR 606.) He found she had a 32 percent whole person impairment attributed to an occupational related injury. (AR 602.)

At the reconsideration stage, State agency non-examining, consulting physician Robert Mitgang, M.D., opined on November 10, 2015, that Plaintiff could: occasionally lift/carry 20 pounds, and frequently lift/carry 10 pounds; her ability to push/pull was unlimited other than as shown for lift/carry; she could stand, walk and sit for about six hours in an eight-hour work day; she could occasionally climb ramps and stairs and balance; she could never climb ladders, ropes or scaffolds; she could occasionally stoop, kneel, crouch and crawl; she should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and even moderate exposure to hazards. (AR 89.)

### 3.  The ALJ's Consideration of the Medical Opinion Evidence & RFC Assessment

It is worth repeating that the ALJ found Plaintiff could perform a reduced range of sedentary work, and included the following limitations: she could lift and carry less than ten pounds; she could stand and walk for two hours; she could occasionally balance, stoop, kneel, and crouch, but was precluded from climbing, ramps, stairs, ladders, ropes, or scaffolds or crawling; she must avoid all exposure to fumes, dusts, odors, gases and poor ventilation, and moving mechanical parts and unprotected heights; and, she required a walker to ambulate.

The ALJ gave the State agency consultant opinions only partial weight, finding that their opinions Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, and that she could sit, stand and walk for 6 hours in an 8-hour day were inconsistent with the medical record. The ALJ said portions of the consultants' opinions were consistent, i.e., that she needed to avoid concentrated exposure to hazards including machinery and heights were consistent with the overall record and given partial weight as a result. (AR 19.)

In giving partial weight to the opinions of Plaintiff's treating and examining providers, the ALJ noted that there are several treatment notes from Concentra Medical Center (Dr. DeMordaunt) and the Sierra Regional Spine Institute (Dr. Rappaport) that indicated the claimant had work restrictions, including permanent restrictions, that limited the claimant to specific functional limitations such as being precluded from lifting greater than 20 pounds, no repetitive lifting over 10 pounds, no kneeling, no squatting, and needing to change positions for 5 minutes every hour; and, that Dr. Glick opined Plaintiff had a 32 percent whole person impairment. (AR 20.) The ALJ said that these statements would indicate the claimant was disabled, but did not use the Social Security Act's formula for determining disability. (AR 20.) In addition, the ALJ stated that the statements were conclusory and provide no explanation of the evidence relied on in determining the claimant was disabled, and were inconsistent with the medical evidence. As a result, these opinions were only given partial weight. (AR 20.)

**4. Analysis**

Preliminarily, insofar as Dr. Glick assessed Plaintiff as having a 32 percent whole person disability, the ALJ was not required to accept the ultimate conclusion on the issue of disability; however, it should have been noted that Plaintiff's subjective complaints to Dr. Glick and Dr. Glick's objective assessments were consistent with the other treatment records. *See Macri v.*

1  *Chater*, 93 F.3d 540, 543-44 (9th Cir. 1996) (finding that California Guidelines for Work Capacity

2  were not conclusive in a social security case, but that the ALJ was entitled to draw inferences that

3  logically flowed from the evidence).

4        The court will now turn to the opinions of Drs. DeMordaunt and Rappaport.

5        The Commissioner argues that the Plaintiff has not set forth any specific limitations from

6  the opinions of Drs. DeMordaunt and Rappaport that the ALJ should have included in the RFC,

7  and that in limiting Plaintiff to a reduced range of sedentary work, the ALJ assessed an RFC

8  consistent with the limitations identified by these doctors.

9        The ALJ's RFC assessment did incorporate many of the limitations imposed by the treating

10  physicians. It is apparent, however, that the ALJ's RFC assessment did not incorporate or include

11  any substantive discussion about the need to alternate between standing and sitting at will, and

12  more specifically, Dr. Rappaport's opinion that Plaintiff should change positions between sitting

13  and standing for five minutes every hour.

14        In addition, the ALJ limited Plaintiff to occasional stooping. According to Social Security

15  Ruling (SSR) 85-15, stooping involves "bending the body downward and forward by bending the

16  spine at the waist[.] SSR 85-15, 1985 WL 56857, at *7.[1] Therefore, the limitation to occasional

17  stooping is inconsistent with Dr. Rappaport's final opinion that Plaintiff could not bend at the

18  waist. The occasional stooping limitation *is* consistent with the opinions of the non-examining

19  State agency consultants, as well as the opinions of Dr. DeMordaunt, although his opinions as to

20

21

22

23

_____

[1] SSRs are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner. 20 C.F.R. § 402.35(b)(1). Although they do not have the force of law, in the Ninth Circuit they are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Quang Van Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

1  bending were rendered prior to Plaintiff's back surgeries and more than a year before

2  Dr. Rappaport's final opinion that she could not bend from the lumbar spine.

3      In order to reject the opinions of a treating provider that were contradicted, the ALJ was

4  required to set forth specific and legitimate reasons supported by substantial evidence in the record.

5      Insofar as the opinions of Drs. DeMordaunt and Rappaport are concerned, the ALJ's

6  reasoning for giving them partial weight is based on a mischaracterization of the record. The ALJ

7  said the opinions were conclusory, provided no explanation of the evidence relied upon, and were

8  inconsistent with the medical evidence. A review of the records and the opinions reveals exactly

9  the contrary. The functional limitation opinions provided by Drs. DeMordaunt and Rappaport were

10 accompanied by detailed clinical observations and examination notes, diagnoses as well as

11 impressions and treatment plans. Moreover, the ALJ did not explain how the opinions were

12 inconsistent with the medical evidence, and a review of the opinions reveals they were entirely

13 consistent with the medical evidence.

14     Dr. DeMordaunt gave his first functional assessment of Plaintiff early on, in December of

15 2013. At that point, he limited her ability to bend, said she was precluded from squatting, and could

16 alternate sitting and standing as tolerated. (AR 354.) She had pain in the lower back that radiated

17 to the right lower extremity with numbness and tingling. She was tender in the spine, and had

18 reduced range of motion and decreased sensation. (AR 354.) When she went to physical therapy

19 shortly thereafter, her spinal flexion had maximum limitation, and her overall improvement was

20 poor. (AR 355.) She tried trigger point injections with no relief, and her pain persisted, and she

21 still had increased pain with lumbar range of motion. At the end of the month, her symptoms were

22 the same and Dr. DeMordaunt continued the restrictions that she could not lift, pull or push greater

23

than 10 pounds; she could not bend more than five times an hour; and, she could alternate sitting and standing as tolerated. (AR 358.)

Her pain level was the same with additional physical therapy and her symptoms were roughly the same, if not worse, at her next appointment with Dr. DeMordaunt on January 9, 2014. (AR 359, 361,364.) She tried facet injections, but they did not give her any relief, and she was referred to Dr. Rappaport. (AR 364.) At that point, Dr. DeMordaunt continued to opine that she could not lift, push or pull over ten pounds; she could not bend more than five times in an hour; she could alternate sitting and standing as tolerated; and added that she could not squat or kneel. (AR 364.)

When she saw Dr. Rappaport initially in January of 2014, she had exquisite tenderness in the lumbar spine and significant tenderness over the SI joints, with limited range of motion that was quite painful for her. (AR 546.) Dr. Rappaport decided to proceed with nerve root block injections, noting she may be a candidate for decompression surgery. (AR 547.) When she saw Dr. DeMordaunt at the end of that month, she still had the back pain and burning, numbness and tingling to the right lower extremity, with limited range of motion causing increased pain. (AR 365-66.) Dr. DeMordaunt again restricted her to lifting, pushing or pulling no more than 10 pounds; she could not bend more than five times in an hour; she could not squat or kneel; and she could alternate between sitting and standing as tolerated. (AR 366.)

She saw Dr. Rappaport on February 12, 2014, and her symptoms were unchanged. Her range of motion remained limited, and she had tenderness and decreased sensation. At that point, Dr. Rappaport opined she was limited to lifting ten pounds or less; she required the ability to change positions as needed; she should avoid bending, twisting at the waist, stooping, reaching above shoulder height and climbing. (AR 543.) When she saw Dr. DeMordaunt on February 27,

2014, she had undergone the nerve root block injection at right L-5, but had no improvement, and if anything, had a worsening of her symptoms. Again, she had reduced range of motion with increased pain, tenderness, and decreased sensation. Dr. DeMordaunt limited her as to bending; said she could not squat or kneel; she could not lift, push or pull greater than 10 pounds; and she could alternate sitting and standing as tolerated. (AR 368.)

Her symptoms persisted, and she had additional nerve root blocks with no relief. On March 27, 2014, Dr. DeMordaunt restricted her to no lifting, pushing or pulling greater than 10 pounds; only occasional bending; no squatting; and she could alternate sitting and standing as tolerated. (AR 370.) When she saw Dr. Rappaport in April of 2014, they discussed that her symptoms were worsening, and she had no relief with non-operative treatment up to that point, and she wanted to proceed with surgery. (AR 540.) She had a normal EMG study with Dr. DeMordaunt on May 5, 2014, but she was still in pain and her medications were not helping. She still had pain and tenderness in the lower spine with reduced range of motion. (AR 539.) At her next appointment with Dr. Rappaport on May 15, 2014, her updated MRI was discussed which showed lumbar disc herniation, stenosis, and facet arthropathy. On examination, she had severe pain with extension and flexion that radiated to her thighs. Her range of motion was limited and produced severe back pain. Dr. Rappaport noted at that time that she had failed with non-operative treatment, and her symptoms were preventing her from doing activities of daily life. He also indicated she had extreme pain with any required bending. It was at that point that surgery was recommended. (AR 536-37.)

She saw Dr. DeMordaunt after Dr. Rappaport's surgery recommendation, confirming she had no relief with conservative treatment modalities. On examination, she still had tenderness in the lower spine, and reduced range of motion with increased pain. Dr. DeMordaunt again restricted

1 her to lifting, pushing or pulling no more than 10 pounds; only occasional bending; no squatting;

2 and alternating between sitting and standing as tolerated. (AR 372.)

3       She was not authorized for surgery until the end of August of 2014, and in the interim her

4 symptoms were described as worsening, intolerable and deteriorating. (AR 532, 533, 535.) She

5 was given a wheelchair due to difficulty ambulating. (AR 533.) On August 14, 2014,

6 Dr. DeMordaunt restricted her to lifting and pulling no more than 10 pounds; no squatting; and

7 she could alternate sitting and standing as tolerated. (AR 374.)

8       She had her first back surgery on September 2, 2014. (AR 383-89.) While she initially had

9 some improvement, it was not long lasting, and following the second surgery on September 23,

10 2014, she developed radicular pain in both lower extremities and severe SI joint pain. (AR 516,

11 518, 520.) She was still using a walker. She was markedly positive for right SI point. (AR 516.)

12 She had an SI joint injection in February of 2015, which provided no relief. (AR 622.) She

13 continued to have difficulty walking. (AR 622.) She had an EMG with Dr. DeMordaunt on March

14 13, 2015, which was abnormal on the left side, which he thought was suggestive of left L5

15 radiculopathy. (AR 620-21.) When she saw Dr. Rappaport for the SI joint pain, he assessed her as

16 being limited to sedentary work only. (AR 619.) She saw him again in April of 2015 for continued

17 back pain and radicular symptoms into the right leg as well as SI joint pain. She had undergone

18 physical therapy, but it was worsening her symptoms. That day, she had significant tenderness

19 over the right SI joint. She had significant sacroiliitis and was advised to discontinue physical

20 therapy. Her work status assessment of sedentary was unchanged. (AR 618.) On May 13, 2015,

21 she saw Dr. Rappaport and was using a walker and walked with a limp on the right side. Again,

22 there was no change in her sedentary work status. (AR 616.)

23

At her last appointment to Dr. Rappaport, before her workers' compensation claim was closed and she transferred to the care of Dr. Udani, she was still having pain in the back with radicular symptoms and was still tender over both SI joints. At that point, he restricted her to lifting no more than 20 pounds, and no more than 10 pounds repetitively; she could bend at the hips, but not at the lumbar spine; standing and sitting were unlimited, but she should change between these positions for five minutes every hour. (AR 614.) He indicated these were permanent restrictions. (AR 614.)

When she transferred care to Dr. Udani, she continued to have sharp and shooting pain; used a walker to ambulate; had tenderness in the lumbar spine; and moderate pain with range of motion. (AR 556, 560, 731-33, 738, 740-43, 757-61, 796.) She underwent another round of physical therapy, and had pain with the exercises, severe impairment in range of motion; tenderness; difficulty walking. (AR 660-69.) She was ultimately discharged because she had increased pain and weakness following the sessions, and there was no improvement in her strength or gait. (AR 655.)

In sum, the ALJ's findings that Drs. DeMordaunt and Rappaport's functional opinions were conclusory, provided no explanation of the evidence relied on, and were inconsistent with the medical evidence, are not supported by substantial evidence in the record. To the contrary, the doctors' functional opinions were consistent with the detailed treatment notes, clinical observations and examination findings, diagnoses, impression and treatment plans that accompanied the opinions. The ALJ erred by failing to provide specific and legitimate reasons supported by substantial evidence in the record concerning their opinions that she needed the ability to alternate between sitting and standing at will (and Dr. Rappaport's opinion she needed

to do so for five minutes every hour), as well as Dr. Rappaport's opinion that she should not bend at the waist.

**G. Claimant Credibility**

Plaintiff argues that the ALJ did not provide clear and convincing reasons for rejecting her subjective claims.

The Commissioner argues that the ALJ reasonably rejected greater RFC limitations because Plaintiff's symptom allegations were not entirely consistent with the evidence in the record.

"[A] claimant's credibility becomes important at the stage where the ALJ is assessing residual functional capacity, because the claimant's subjective statements may tell of greater limitations than can medical evidence alone." *Tonapetyan v. Halter*, 242 F.3d 1144, 1147 (9th Cir. 2001) (citing SSR 96-7P)). Thus, a claimant's credibility is often crucial to a finding of disability. The ALJ is responsible for determining credibility. *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007).

There is a two-step test for determining the extent to which a claimant's symptom testimony must be credited:

> First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. In this analysis, the claimant is *not* required to show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom. Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof.
> If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases.

1  *Garrison v. Colvin*, 759 F.3d 995, 1014-15 (9th Cir. 2014) (internal quotation marks and

2  citations omitted) (emphasis original).

3  An ALJ may consider various factors in assessing the credibility of the allegedly disabling

4  subjective symptoms, including: daily activities; the location, duration, frequency, and intensity of

5  pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and

6  side effects of any medication taken to alleviate symptoms; treatment, other than medication,

7  received for relief of symptoms; any measures a claimant has used to relieve symptoms; and other

8  factors concerning functional limitations and restrictions due to symptoms. 20 C.F.R. §

9  404.1529(c), § 416.929(c). The ALJ may also consider ordinary techniques of credibility

10  evaluation, or an "unexplained or inadequately explained failure to seek treatment or to follow a

11  prescribed course of treatment." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (quotation

12  marks and citation omitted).

13  Here, the ALJ found Plaintiff's medically determinable impairments could reasonably be

14  expected to cause the alleged symptoms, but stated that Plaintiff's statements concerning the

15  intensity, persistence and limiting effects of these symptoms were not entirely consistent with the

16  medical evidence and other evidence in the record. (AR 18.) The ALJ went on to summarize the

17  medical records. (AR 18-19.) The ALJ indicated that he generously accommodated Plaintiff's

18  subjective complaints into the RFC assessment. (AR 19.) The only other mention of Plaintiff's

19  credibility comes at the end of the RFC assessment portion of the opinion, where the ALJ stated

20  that Plaintiff's subjective complaints were "not fully consistent and the objective medical evidence

21  does not support the alleged severity of the symptoms." (AR 20.)

22  The ALJ provided no explanation of what specific subjective symptom statements he found

23  inconsistent or how they were not supported by the objective medical evidence. A review of both

37

the Plaintiff's testimony and adult function report as well as the lay witness statement from her cousin/roommate reveal internal consistency. Those statements, in turn, appear to be entirely consistent with both her subjective complaints in the medical records and the objective medical findings, as well as the treating physician opinions regarding her functional abilities.

"[P]roviding a summary of medical evidence in support of a residual functional capacity finding is not the same as providing clear and convincing *reasons* for finding the claimant's symptom testimony not credible." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015).

The Commissioner argues that the ALJ's RFC assessment accommodated the limitations found by the treating physicians; therefore, Plaintiff failed to show any error.

The ALJ's RFC assessment, however, did not address all the functional limitations set forth by her treating providers. This is of consequence because while the RFC accommodated many of her limitations, it said nothing about the need to change positions (Dr. Rappaport last opined that she needed to change between sitting and standing positions for five minutes every hour). In addition, the ALJ's RFC concluded Plaintiff could occasionally stoop while Dr. Rappaport's last functional assessment said she could not bend at the waist.

The ALJ did not specifically explain how Plaintiff's subjective statements that she had issues bending (she testified she used adaptive equipment to get things so as not to have to bend and to assist in daily activities) and needed to change positions frequently (she testified she had to change positions throughout the day and she could not sit or stand for long) were not credible. Again, these subjective complaints appear to be entirely consistent with the medical record and Dr. Rappaport's opinions on her functional abilities.

In sum, the court finds that the ALJ did not set forth clear and convincing reasons for rejecting the claimant's subjective symptom statements regarding her ability to bend/stoop and need to change positions; therefore, the ALJ erred.

**H. Reversal and Remand for Further Proceedings**

Plaintiff asks the court to grant her motion, vacate the Commissioner's final decision, and remand the matter for further proceedings, i.e., a de novo hearing and decision. (ECF No. 14 at 25.) Considering the court's findings that the ALJ erred with respect to the medical opinion evidence and in discrediting Plaintiff's subjective symptom statements, the court will address whether remand for further proceedings or for calculation and award of benefits is appropriate.

"The decision whether to remand a case for additional evidence, or simply to award benefits[,] is within the discretion of the court." *Revels v. Berryhill*, 874 F.3d 648, 668 (9th Cir. 2017) (citation and quotation marks omitted); *see also Leon v. Berryhill*, 880 F.3d 1041, 1044 (9th Cir. 2017), *as amended* January 25, 2018 (The credit-as-true "rule itself permits, but does not require, a direct award of benefits on review..."). "[I]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded for further proceedings." *Revels,* 874 F.3d at 668 (citation and quotation marks omitted).

"An automatic award of benefits in a disability benefits case is a rare and prophylactic exception to the well-established ordinary remand rule." *Leon,* 880 F.3d at 1044 (citation omitted). That is to say, "[w]hen the ALJ denies benefits and the finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Id*. at 1045 (citation omitted).

A case *may* be remanded for the calculation and award of benefits if several criteria are met. First, the ALJ must have "failed to provide legally sufficient reasons for rejecting evidence,

whether claimant testimony or medical opinion." *Leon*, 880 F.3d at 1045. Second, the record must be fully developed such that further administrative proceedings would serve no useful purpose. *Id.*; *see also Revels*, 874 F.3d at 668. When these two conditions are satisfied, the improperly discredited evidence is credited as true, and the court must determine whether the ALJ would be required to find the claimant disabled on remand and whether "on the record taken as a whole, there is no doubt as to disability." *Leon*, 880 F.3d at 1045; *Revels*, 874 F.3d at 668.

First, the court found there is a basis to remand to determine whether Plaintiff met or equaled Listed Impairment 1.04C. In addition, the ALJ failed to provide legally sufficient reasons for rejecting portions of the opinions of Plaintiff's treating doctors, Drs. DeMordaunt and Rappaport. In addition, the ALJ failed to provide legally adequate reasons for rejecting certain of Plaintiff's subjective symptom statements.

Second, the court must address whether the record has been fully developed and if further administrative proceedings would serve any useful purpose.

The administrative record contains 859 pages, which includes over 30 pages from the administrative hearing with testimony from both Plaintiff and the VE, as well as some 500 pages of medical records and opinions. It also includes the reports of the State agency consultants at the initial and reconsideration stages, and the evaluation and report from Dr. Glick. There is also Plaintiff's adult function report and the lay witness statement of her cousin/roommate. The record seems to fully developed in this regard; however, "[t]he second step of the credit-as-true analysis [also] requires us to determine whether the record … is free of conflicts, ambiguities, or gaps." *Leon*, 880 F.3d at 1046-47 (citation omitted).

The court will assess whether the record is free of conflicts, ambiguities or gaps and whether a finding of disability would be required on remand first with respect to the requirement of alternating between sitting and standing, and then as to the bending/stooping limitation.

As to the need to alternate between sitting and standing, Plaintiff's treating providers consistently assessed Plaintiff as requiring this functional limitation. (AR 354, 358, 366, 372, 374, 543.) At her last appointment with Dr. Rappaport in June of 2015, he opined that she should change between standing and sitting for five minutes every hour. (AR 614.) This is consistent with Plaintiff's hearing testimony, her adult function report, and the lay witness statement of her cousin/roommate. Thus, there are no ambiguities, conflicts or gaps as to this issue.

The court must consider whether the ALJ would be required to find the claimant disabled on remand if the treating providers' opinion that Plaintiff must be able alternate between sitting and standing at will, and specifically, for five minutes every hour, is credited. While the ALJ did not include this limitation in his RFC assessment, he did ask the VE a hypothetical that included a limitation where the person had to alternate between sitting and standing for five minutes every *two hours*. The VE testified that would eliminate the addresser position, and would erode the charge account clerk position by 75 percent (leaving it at 6,000 positions nationally), and it would erode the final assembler position by 90 percent (leaving it at 500 positions nationally). (AR 59-60.)

Neither the VE nor the ALJ addressed Dr. Rappaport's opinion that Plaintiff had to alternate between sitting and standing for five minutes *every hour*. It is not clear whether a significant number of jobs would be available with this specific restriction; therefore, remand is appropriate on this issue.

Even if Dr. Rappaport had limited Plaintiff to alternating between standing and sitting for five minutes *every two hours,* neither the VE nor the ALJ specifically addressed whether 6,000 charge account clerk positions and 500 final assembler positions nationwide were a significant number of jobs if Plaintiff were so limited, and there was no discussion of the availability of jobs regionally. *See* 42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B). (a significant number of jobs at step five can be either regionally (the region in which the claimant resides) or in several regions of the country (national jobs).

On remand, any determination as to whether jobs exist that Plaintiff could perform if limited to alternating between sitting and standing for five minutes every hour must also include an analysis of whether the number of jobs is significant either nationwide or regionally.

The court will now address whether there are any gaps, ambiguities, or conflicts with respect to Plaintiff's ability to bend/stoop.

Initially, from December of 2013 to Jan of 2014, Dr. DeMordaunt limited Plaintiff's ability to bend to not more than five times in an hour. (AR 354, 358, 365, 366.) In February of 2014, Dr. Rappaport said she should avoid bending and twisting at the waist as well as stooping. (AR 543.) When she saw Dr. DeMordaunt shortly after that, he said bending was limited. (AR 368) At her next visit with Dr. DeMordaunt, however, he limited her to occasional bending. (AR 370.)

When she saw Dr. Rappaport in May of 2014, after an updated MRI, she had severe pain with extension and flexion, and limited range of motion which produced severe back pain. Dr. Rappaport's notes that day stated specifically that she indicated extreme pain with any required bending. (AR 536-37.) At that point, Dr. Rappaport recommended proceeding with surgery. When she saw Dr. DeMordaunt on May 29, 2014, following Dr. Rappaport's surgery recommendation, Dr. DeMordaunt limited her to occasional bending. (AR 372.) Her condition deteriorated and she

was given a wheelchair by Dr. Rappaport's office. (AR 533.) On August 14, 2014, while she was still waiting to be authorized for surgery, Dr. DeMordaunt gave limitations for lifting and pulling, squatting and sitting/standing, but did not address bending. (AR 374.)

She had two back surgeries, and while she had some initial lower extremity relief, her pain returned along with severe pain over the SI joints and radiating pain to both lower extremities. She continued to use a walker to ambulate. When she saw Dr. Rappaport in March, April and May of 2015, he classified her work status to sedentary only, but did not address any specific functional limitations. (AR 616-19.) At her final appointment with Dr. Rappaport on June 10, 2015, he said she had reached maximum medical improvement status. At that point, he opined that she could bend at the hips, but should not bend at the lumbar spine. (AR 614.) He stated that this was a permanent restriction. (AR 614.) When she transferred care to Dr. Udani she continued to have pain with range of motion. In fact, her medical records consistently reported severe impairment in range of motion. (AR 358, 365-66, 368, 372, 536-37, 539, 543, 546, 556, 560, 660-669, 731-33, 738, 740-43, 757-61, 796.)

There is admittedly some ambiguity between Dr. DeMordaunt's and Dr. Rappaport's bending restrictions, with Dr. Rappaport stating Plaintiff should avoid bending from the lumbar spine and Dr. DeMordaunt finding Plaintiff could bend occasionally. Dr. DeMordaunt's opinions on bending, however, were given before Plaintiff had her two back surgeries and subsequent development of SI joint pain and pre-dated Dr. Rappaport's final opinion on her functional abilities by more than a year. The court is doubtful that any ambiguity remained between the opinions when more than a year passed between Dr. DeMordaunt's last opinion that Plaintiff could bend occasionally and Dr. Rappaport's final opinion that Plaintiff should not bend at the waist. Nevertheless, Dr. DeMordaunt's opinions were consistent with those of the non-examining

consultants with respect to occasional bending. Therefore, this issue should be resolved by the ALJ on remand.

On remand, if the ALJ finds Dr. Rappaport's final limitation on bending from the lumbar spine is supported by substantial evidence and not contradicted by earlier opinions by others that she could bend occasionally, the ALJ must address another issue recently confronted by this court—whether an inability to stoop precludes sedentary work.

This issue was recently presented to the court in *Williams v. Berryhill*, Case No. 3:18-cv-00175-LRH-WGC. In that case, the undersigned concluded that the ALJ erred by not setting forth legally sufficient reasons supported by substantial evidence for rejecting the opinion of a consultative examining physician that the claimant was precluded from stooping. In applying the credit-as-true analysis, the court found the ALJ erred in this regard and that the record had been fully developed. The question was whether crediting that opinion as true would require a finding the claimant was disabled.

In *Williams*, the VE testified that while the DOT actually contains sedentary occupations that it defines as *not* requiring stooping, in his experience he did not believe that to be realistic, and in fact, every sedentary job would require at least a little stooping. There, the VE testified that claimant who could not stoop would be precluded from sedentary work.

The undersigned found the VE's testimony was consistent with SSR 85-15, which states that stooping "is required to do almost any kind of work[.]" SSR 85-15, 1985 WL 56857, at * 7. SSR 96-9P states that "[a]n ability to stoop *occasionally*; i.e., from very little up to one-third of the time, is required in most unskilled sedentary occupations." SSR 96-9P, 1996 WL 374185, at *8 (emphasis added).  Similar to SSR 85-15, SSR 96-9P provides that "[a] *complete* inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the

individual is disabled would usually apply, but restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work." *Id*. (emphasis original). The ruling advises that "[c]onsultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping." *Id*.

The ALJ in *Williams* had consulted with a vocational resource, who testified unequivocally that a claimant who could not stoop would be precluded from sedentary work. Therefore, if the consultative examining physician's opinion that the claimant could not stoop was credited, it would require a finding of disability.

Here, unlike in *Williams*, neither the ALJ nor the VE ever actually addressed a limitation that claimant was precluded from stooping. On remand, if Plaintiff is determined to be precluded from stooping, the ALJ should consult a VE regarding whether she is then precluded from sedentary work.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING** Plaintiff's motion (ECF No. 14); **DENYING** the Commissioner's cross-motion to affirm (ECF No. 15); and **REMANDING** this matter for further administrative proceedings consistent with this Report and Recommendation.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

DATED: February 15, 2019.

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE